## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, : : : | |
| Plaintiff, : | |
| : v. : | CASE NO. 1:24-cv-00816 |
| : | |
| PISON STREAM SOLUTIONS, INC. and JOSEPH JAMES, JR., : : | JUDGE JAMES S. GWIN |
| : Defendants, and : | JURY DEMANDED |
| : GENACTS LLC and SOISI LLC, : | |
| : Relief Defendants. : | |

## FIRST AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows:

### INTRODUCTION

1.　　This case involves a fraudulent scheme orchestrated by Defendant Joseph James, Jr., to divert to himself millions of dollars from investors in a startup company he controlled, Defendant Pison Stream Solutions, Inc. ("Pison"). Between at least December 2017 and September 2022, James and Pison raised approximately $32.5 million by offering and selling Pison's securities. Investors were told those funds would be used to support Pison. Despite those promises, James and Pison siphoned off more than $10.8 million of investor money for James's personal benefit. James used that money to live a luxurious lifestyle, buying homes, expensive cars, jewelry, art, and even a private airplane.

2.      James directed the offer and sale of debt and equity securities on behalf of Pison, and he also offered and sold his personal Pison securities to investors.  In all, at least 85 investors in 15 states purchased Pison securities, either directly from James or through Pison.

3.      Pison is a private chemical coatings company James founded and controlled, but Pison never grew beyond its start-up status.  Between 2018 and 2022, Pison only recognized approximately $6,800 in total revenues from selling its products and services.  With almost no money coming in from its operations, the ultimate source of the millions of dollars James received was from Pison investors.

4.      James told investors that Pison was engaged in cutting-edge research and development and needed money to grow the company, such as by securing necessary inventory.  Although some investor funds were used for those disclosed purposes, unbeknownst to investors James took millions of dollars for his own undisclosed personal uses.

5.      James portrayed himself as independently wealthy, and he repeatedly told investors he never took a salary from Pison.  But the reality was very different.  James needed investor funds to live a lavish lifestyle.  James used investor funds to pay personal expenses, and buy, among other things, two expensive homes, luxury cars from manufacturers including Maserati, Audi, Cadillac, Land Rover and BMW, and fancy watches.  He even leased a Rolls-Royce automobile and purchased a 2005 Raytheon Hawker 800 XP private jet.  During the period of the fraudulent scheme James had no other source of income, and his wife earned a low six-figure income from her employment with a different company.

6.     To help promote the illusion that Pison was a successful business, in August 2019, James moved the company's headquarters from Ohio to One World Trade Center in New York City.  He also rented an expensive Manhattan apartment for his personal use.

7.     James used two entities he created—Relief Defendants Genacts LLC ("Genacts") and Soisi LLC ("Soisi")—to hold some of the personal assets he acquired with investor funds.

8.     The SEC brings this lawsuit to hold James and Pison responsible for their fraud, prevent them from harming future investors, and return money to their victims.

## JURISDICTION AND VENUE

9.     The SEC brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

10.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

11.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Ohio and elsewhere.

12.     James and Pison (collectively, "Defendants") each reside and transact business within the Northern District of Ohio.

13.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

**DEFENDANTS**

14.     **Joseph James, Jr.**, age 58, is a resident of Bratenahl, Ohio.  During the relevant time period, James also maintained residences in the States of Florida, Tennessee, and New York.  James has served as Pison's CEO since he formed the company.  James has also served as the Chairman of Pison's Board of Directors since the inception of the board. Before founding Pison, James worked as a chemist for various companies.

15.     **Pison Stream Solutions, Inc.** is a Delaware corporation with its most recent principal place of business in Broadview Heights, Ohio.  Pison engages in researching and developing products in the chemical coatings industry.  James formed Pison as Pison Stream Solutions, LLC in Tennessee in or around 2011.  In August 2018, James directed the conversion of Pison Stream Solutions, LLC to a Delaware corporation, and it became known as Pison Stream Solutions, Inc.

16.     In the course of the SEC's investigation that preceded this lawsuit, James and Pison executed tolling agreements that suspend any applicable statutes of limitations for the period November 17, 2022 through May 20, 2024.

**RELIEF DEFENDANTS**

17.     **Genacts LLC** is a Florida for-profit limited liability company formed by James in or about February 2019.  James has been its sole member since March 2019.

18.     **Soisi LLC** is an Ohio for-profit limited liability company formed by James in or about March 2018.  James is and has been its sole member.

4

## FACTS

### A. Pison's Business and Finances

19.     James has been Pison's CEO since he formed Pison Stream Solutions, LLC, the predecessor to Pison.  Since 2011, James has presented Pison as engaging in cutting-edge research and development of chemical coatings for niche markets, such as defense, aerospace, and automotive applications.

20.     In 2018, after James converted the predecessor LLC into a corporation, he gave Pison the trappings of corporate governance.  James created a board of directors (the "board"), made himself Chairman, and invited several early investors and also outsiders to sit on the board.  At James's direction, Pison also hired a CFO and other employees.

21.     Since 2011, Pison has never been profitable.  Between 2018 and 2022, Pison recognized only approximately $6,800 in total revenues.

22.     Unable to fund operations from the sale of its chemical products or services, Pison's primary source of cash flow was money raised from investors.  Between December 2017 and September 2022, investors purchased approximately $32.5 million of Pison securities in multiple offerings.  Some of those securities were purchased directly from Pison, which made a series of offerings of both debt and equity securities.  In other instances, James offered and sold his personally-held Pison securities to investors, while representing to those investors that he would direct the proceeds of the sales to Pison.

23.     Pison did not differentiate in its use of funds between cash it received from investors in the Pison offerings and cash it received when James directed funds to Pison after he sold personally-held securities to investors.  Pison used both sources of cash

interchangeably.  Pison used investor funds to pay certain operating expenses, and also to make payments to James.

24.    At all times, James maintained voting and operational control of Pison.  As CEO, James had the power to bind Pison to most corporate actions during the entire time from December 2017 until September 2022.  During that same period, James had at least joint control of all of Pison's bank accounts.  James controlled how Pison spent money, and all withdrawals from its accounts required his approval.

25.    As more fully described below, Pison and James raised money from investors through a series of securities offerings beginning in December 2017.  In that period, Pison conducted twelve offerings and filed with the Commission seven Notices of Exempt Offering of Securities on Form D under the Securities Act.  In addition, James offered and sold his own Pison securities to investors.

26.    The securities offerings and sales were documented with varying degrees of formality and detail.  In some instances, the offering documents exceeded one hundred pages and contained detailed information about Pison's business, governance, and finances. Other offerings and sales transactions were documented with shorter and less detailed purchase agreements.  Still other transactions were documented, if at all, with simple agreements confirming little more than the purchase price and the number and type of securities being sold.

27.    James communicated directly with prospective investors, either orally or by email.  In other instances, agents communicated with prospective investors on behalf of James and Pison and acting at their direction.  The agents who assisted James and Pison in finding investors or raising funds from existing investors were, themselves, investors.  Some

of the agents served on Pison's board and/or performed work for Pison in some capacity, without pay.

28.     As part of James's efforts to portray Pison as a successful business, in August 2019 he moved the company's headquarters from Ohio to One World Trade Center in New York City.  James also used investor funds to purchase luxury cars, watches, and other items for himself to create the false appearance that he was independently wealthy.  Meanwhile, James repeatedly told investors he took no salary from Pison, while failing to disclose that his lavish lifestyle was funded almost entirely with investor funds.

29.     In reality, Pison always had problems with cash flow.  As time went on, it struggled to pay rent and its employees.  It was evicted from its Ohio offices and production facility in October 2021 and its One World Trade Center office in April 2023 after it failed to make required lease payments.  But despite these cash flow struggles, Pison continued to prioritize payments to James, which he used for his personal expenses, at the expense of investors and other creditors, as more fully detailed below.

**B.  Pison's Offer and Sale of Securities**

30.     Between December 2017 and November 2021, Pison raised approximately $10.3 million through a total of 12 offerings of either debt or equity securities.  Each offering is discussed in detail in paragraphs 35 – 99 below, and each offering involved "securities," as that term is defined in the Securities Act and the Exchange Act.

31.     The offering documents given to prospective and/or current investors identified various uses for the investor funds raised, including purchasing raw materials, increasing working capital, research and development, and paying various operating and

financing costs.  None of the offering documents disclosed that a significant portion of the funds raised would be used by James to pay personal expenses.

32.     When Pison needed more money, James informed Pison's board. The board approved the offerings, but did not track the investor funds Pison raised or received.  The board also did not track how Pison or James were using the proceeds of the various offerings.

33.     James typically drafted the communications Pison sent to prospective investors and provided Pison's agents with the information they communicated to prospective investors.  James or others from Pison typically had oral discussions with prospective investors before they invested.  In those discussions, James and others, at James's direction, told prospective investors about Pison's need for new investor funding to pay operating or other business expenses.  James, and others acting at James's direction, never disclosed in those discussions that a substantial portion of the money received from investors would be used to pay James's own personal expenses, a fact that was known to James but not others offering Pison securities to investors.

34.     James began using investor funds for his own personal benefit no later than March 2018, when Pison wired over $2 million to a title company to purchase a house for James.  After March 2018, James and Pison made additional offerings and sales of securities without disclosing to investors that James had already begun misusing investor funds.  By continuing to offer and sell securities after James had begun using investor funds for his own personal purposes but without disclosing that misuse to investors, Pison and James made false and misleading statements to investors regarding the use of their funds.

### a. December 2017-September 2018 Debt Offering ("Pison Offering 1")

35.     Between December 2017 and September 2018, an investor ("Investor 1") purchased a series of six promissory notes, totaling $730,000, from Pison.  Each note had a 10% interest rate and an initial term of 90 days, which could be extended for an additional 90 days.  James executed the first five notes as president of Pison Stream Solutions, LLC, and the sixth note as president of Pison.

36.     Pison did not repay any of the notes at maturity.  At James's request, Investor 1 agreed to extend each of the notes due to Pison's lack of available funds.

37.     In October 2019, Pison and Investor 1 agreed to consolidate all of the outstanding amounts into an Amended and Restated Convertible Promissory Note.  The Amended and Restated Convertible Promissory Note stated that the funds would "be used for the immediate working capital needs of the Company," except that "organizational, legal, accounting, and filing fees payable in connection with this Offering may be paid for by the proceeds raised through this Offering."

38.     The Amended and Restated Convertible Promissory Note also stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for working capital purposes of the Company."

### b. February 2019 – June 2019 Equity Offering ("Pison Offering 2")

39.      Between February and June 2019, Pison sold $1,025,000 of equity securities to several investors.  James and others at Pison acting at James's direction told investors those funds would be used to benefit the company.

40.     In an email dated February 1, 2019, a Pison board member ("Board Member 1") wrote to several prospective investors, telling them that "we need some additional capital for raw materials over the next two weeks."

41.     In an email dated May 8, 2019, Pison's CFO wrote to a group of existing investors, saying the company was seeking to raise $2.5 million.  The CFO's email stated: "The proceeds will be used to fund fees required to complete the QPD [Qualified Products Database of the Department of Defense] application process, purchase additional raw materials and fund working capital requirements . . . ."

42.     In an email to existing investors dated June 13, 2019, on which James was copied, Pison's Vice President of Corporate Business Development ("Vice President 1") wrote that the company had an "immediate need to purchase additional raw materials as we continue to build finished goods inventory."  Vice President 1's email offered investors the opportunity to purchase additional shares of Pison.  Attached to Vice President 1's email were two emails from James stating that Pison had been accepted into the QPD system, and would need to increase its working capital to be able to fulfill large volume orders for the United States military.

43.     James and the other Pison executives did not disclose to investors their money would ultimately be used to pay for James's personal expenditures and lifestyle.

c.  **March-April 2019 Debt Offering ("Pison Offering 3")**

44.     In March and April 2019, Pison sold additional promissory notes to two investors ("Investor 2" and "Investor 3").  The total face value of the promissory notes was $1.5 million.  The notes paid interest at an annual rate of 10%, and the notes were due to be repaid on December 31, 2019.

45.     The notes provided that all current or future promissory notes issued by Pison to James, Investor 1, Investor 2, or Investor 3 would be deemed "Senior Notes" that would all be paid on a *pro rata* basis, and would have priority of repayment over loans Pison received from any other source.

46.     In October 2019, Pison made another offering of promissory notes on more favorable terms for investors than notes previously issued to Investor 1, Investor 2 and Investor 3. Pison agreed to issue new notes to Investor 1, Investor 2 and Investor 3 that matched the terms of the new offering. Thus, in October 2019, Pison consolidated all of the outstanding amounts owed to Investor 2 and Investor 3 into Amended and Restated Convertible Promissory Notes that were identical in form to the Amended and Restated Convertible Promissory Note with Investor 1.

47.     The Amended and Restated Convertible Promissory Notes stated that investor funds would "be used for the immediate working capital needs of the Company," except that "organizational, legal, accounting, and filing fees payable in connection with this Offering may be paid for by the proceeds raised through this Offering." Again, James and Pison failed to disclose to Investors 2 and 3 that their money would ultimately be used to pay for James's personal expenditures and lifestyle.

**d.     July 2019 Equity Offering ("Pison Offering 4")**

48.     On July 6, 2019, Vice President 1 emailed prospective investors to offer between $2 million and $3.5 million in additional Pison equity securities. Vice President 1's email, on which James was copied, said the offering was "an effort to fund immediate access to cash to be used primarily to purchase raw materials to produce CARC . . . ."

CARC, which stands for Chemical Agent Resistant Coating, is a specialized type of paint used primarily on military vehicles.

49.     Several documents were attached to Vice President 1's email.  One of those documents was an Offering Term Sheet.  The introductory paragraph of the Offering Term Sheet stated that the offering was "for the purpose of raising money to facilitate satisfying orders from customers subsequent to the inclusion of Pison in the U.S. Army's Qualified Productions Database ('**QPD**'), and to pay off a portion of existing debt."

50.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for the purposes described in the introductory paragraph of this Term Sheet."

51.     Pison filed a Form D with the Commission on July 22, 2019 in connection with Pison Offering 4.  The Form D stated that $700,000 of the offering proceeds would be used to reimburse officers, directors, or promoters for advances to fund working capital needs.  That information was contained only in the Form D, and not in the offering materials that were distributed to investors.  James signed the Form D.

52.     Several investors purchased equity securities, and the offering resulted in Pison raising $3,015,294.  Neither James nor Pison disclosed to the investors their money would ultimately be used to pay for James's personal expenditures and lifestyle, or that Pison would prioritize payments to James over other investors or creditors.

**e.  October 2019-December 2019 Debt Offering ("Pison Offering 5")**

53.     In an email to prospective investors dated October 21, 2019 and transmitted through his executive assistant, James stated that the Pison board had authorized an offering of convertible promissory notes.  The attachments to the email stated that there

would also be an exchange of the existing promissory notes with James, Investor 1, Investor 2, and Investor 3 into amended and restated convertible notes.

54.     As part of the offering, James provided prospective investors, including Investor 1, Investor 2, and Investor 3, with an Offering Term Sheet.  The introductory paragraph of the Offering Term Sheet stated the offering was made "for the purpose of raising capital to be used for the immediate working capital needs of the Company."

55.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for working capital purposes of the Company."

56.     On October 22, 2019, Pison sold a note to Investor 1 for $100,000.  The note was due in 240 days, with interest payable at a rate of 15% for the first 120 days and 25% for the second 120 days.  Investor 1 had the option to convert the outstanding debt into Pison shares in a contemplated subsequent equity offering.

57.     The October 2019 note stated that there were approximately $8.3 million in Senior Notes outstanding as of August 31, 2019 that had a right to be repaid first before any other lending source.  But the October 2019 note further stated that the Senior Notes would be amended before the closing of the current offering so as to make their repayment subordinate in terms of priority to all October 2019 notes.

58.     Investor 2 and Investor 3 each purchased a $150,000 convertible promissory note, and Pison received their funds on December 30, 2019.

59.     After Investor 3 inquired about the terms of the notes he purchased, James confirmed in an email that the notes purchased by Investor 2 and Investor 3 were on the same terms as the October 2019 convertible promissory note offering.

60.     Pison filed a Form D with the Commission on November 5, 2019 in connection with Pison Offering 5.  James signed the Form D.

61.     During Pison Offering 5, James and Pison never told investors James would use their money for personal expenditures or prioritize Pison's payments to James over other investors or creditors.

### f.   January 2020 Debt Offering ("Pison Offering 6")

62.     Pison's CFO sent an email to prospective investors, all of whom were existing Pison shareholders, dated January 9, 2020.  In that email, on which James was copied, the CFO stated that, in anticipation of Pison being approved to have products listed in the military's QPD, "[i]t is important that the company has sufficient funding to maintain inventory levels to meet anticipated demands and for working capital."

63.     The CFO's email went on to state that Pison would soon conduct an equity offering.  "In the interim, additional funding is required for inventory purchases and working capital.  Pison must have sufficient finished goods available to fill customer orders within 10 days of receipt."

64.     To meet those interim funding needs, the CFO's email asked the shareholders to purchase new debt securities.  The CFO's email added, "Joe James has committed to a $50,000 investment to kick start this process and is requesting that you participate in this effort."

65.     The following day, January 10, 2020, the CFO emailed a package of offering documents to the shareholders.  James was copied on the email.  One of the documents was an Offering Term Sheet.  The introductory paragraph to the Offering Term Sheet stated the

offering was conducted "for the purpose of raising capital to be used for the immediate working capital needs of the Company, including the purchase of raw materials."

66.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for working capital purposes of the Company."  None of the materials sent to investors disclosed James would use their money for personal uses.

67.     Several investors purchased promissory notes, collectively totaling $133,000, in the January 2020 offering.  The promissory notes were due on December 31, 2020 and paid interest at a rate of 15% annually.

### g.  February 2020 Debt Offering ("Pison Offering 7")

68.     Pison conducted another debt offering in February 2020.  The promissory notes it offered were due on June 15, 2020 and paid interest at a rate of 15% annually.

69.     Pison provided prospective investors with an offering package consisting of several documents.  One of the documents provided to prospective investors was an Offering Term Sheet. The introductory paragraph to the Offering Term Sheet stated the offering was conducted "for the purpose of raising capital to be used for the immediate operating and working capital needs of the Company."

70.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for operating and working capital purposes of the Company."

71.     The promissory note stated that there were approximately $5.85 million in Senior Notes outstanding, and that the holders of those notes were entitled to be paid first, before any other unsecured notes of the company.  The promissory notes represented that,

before executing the notes, Pison shall have obtained the agreement of each Senior Note holder "that the priority of payment between the holders of the February 2020 Notes shall be equal to the priority of payment of the Senior Notes."

72.     Pison filed a Form D with the Commission on February 28, 2020 in connection with Pison Offering 7.  James signed the Form D.

73.     Several investors purchased promissory notes, collectively totaling $2,070,000, in Pison Offering 7.  None were told their money would be used by James for personal purchases, or that Pison would prioritize payments to James over other investors or creditors.

**h.  July 2020 Equity Offering ("Pison Offering 8")**

74.     On July 27, 2020, James wrote an email, which he transmitted to existing Pison investors through his executive assistant, in which he discussed a contemplated $5 million offering of Pison's shares.  James's email stated: "Proceeds from the offering would be used to purchase active ingredients and other raw materials and produce finished goods and for working capital, including funding to support efforts to secure 'EPA' approval for our antimicrobial product – this product will be sold as a Super Durable Cleaner until a EPA registration is available to us."

75.     James's email invited interested investors to request a Private Placement Memorandum ("PPM") with additional information about the terms of the offering.  Some Pison shareholders expressed interest, and Pison provided the PPM to those investors.

76.     The PPM contained a summary section titled "Key Terms of the Offering and the Class A Voting Common Stock."  In that section, next to the heading "Use of Proceeds", the PPM stated the funds raised in the offering would be used:

(a) to acquire raw materials to make sufficient inventory to meet customer's needs; (b) to continue to create and protect the intellectual property and research and development of the Company; (c) to fund the sale, marketing and promotion of the Company's services to its potential customers; (d) to provide working capital to fund expenses related to general operations and administration of the Company and (e) to pay off existing debt, as needed, including, potentially, amounts outstanding under the Convertible Notes. The Company may, in its sole discretion, decide to allocate the net Offering proceeds to different working capital categories and in any proportion it deems reasonable or utilize them for other reasons.

77.     The PPM contained a section titled "Remuneration of Directors and Executive Officers." That section stated that directors were not compensated for their services and executive officers had received no salary. The section further stated: "Executive officers have elected to defer going onto the Company's payroll in order to maximize the available cash to fund the Company's available cash resources."

78.     One investor purchased shares in the offering for $100,000. That investor was never told that Pison would prioritize paying James over other investors and creditors.

### i.  September 2020 Debt Offering ("Pison Offering 9")

79.     Pison conducted another debt offering in September 2020. The promissory notes it offered were due on October 1, 2021 and paid interest at a rate of 15% annually.

80.     Pison provided prospective investors with an offering package consisting of several documents. One of the documents provided to prospective investors was an Offering Term Sheet. The introductory paragraph to the Offering Term Sheet stated the offering was conducted "for the purpose of raising capital to be used for the immediate operating and working capital needs of the Company."

81.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for operating and working capital purposes of the Company." Next to the

heading "Existing Senior Notes and Securities of the Company", the Offering Term Sheet stated that there were approximately $4 million in Senior Notes outstanding, and "[t]he holders of the Senior Notes have agreed that the Senior Notes shall be equal in priority to the September 2020 Notes."

82.     Pison filed a Form D with the Commission on October 8, 2020 in connection with Pison Offering 9.  James signed the Form D.

83.     Several investors purchased promissory notes, collectively totaling $670,000, in Pison Offering 9.  None of these investors were told their money would ultimately be used to support James's personal purchases and lifestyle.

**j.  March 2021 Debt Offering ("Pison Offering 10")**

84.     Pison conducted another debt offering in March 2021.  The promissory notes it offered were due on June 30, 2021 and paid interest at a rate of 15% annually.

85.     Pison provided prospective investors with an offering package consisting of several documents.  One of the documents provided to prospective investors was an Offering Term Sheet. The introductory paragraph to the Offering Term Sheet stated the offering was conducted "for the purpose of raising capital to be used for the immediate working capital needs of the Company, including the purchase of raw materials."

86.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for working capital purposes of the Company."

87.     Pison filed a Form D with the Commission on April 14, 2021 in connection with Pison Offering 10.  James signed the Form D.

18

88.     Several investors purchased promissory notes, collectively totaling $125,000, in Pison Offering 10, without being told their money would ultimately be used for James's personal benefit.

**k.  June 2021 Debt Offering ("Pison Offering 11")**

89.     Pison conducted another debt offering in June 2021.  The promissory notes it offered were due 12 months after issuance and paid interest at a rate of 25% annually.

90.     Pison provided prospective investors with an offering package consisting of several documents.  One of the documents provided to prospective investors was an Offering Term Sheet. The introductory paragraph to the Offering Term Sheet stated the offering was conducted "for the purpose of raising capital to be used for the immediate working capital needs of the Company, including the purchase of raw materials."

91.     Next to the heading "Use of Proceeds", the Offering Term Sheet stated: "The net proceeds from this Offering may be used to cover the expenses associated with this Offering and for working capital purposes of the Company, including payment of certain legal fees, back utilities and back rent to the landlord of the Company's Brecksville, Ohio facilities."

92.     Pison filed a Form D with the Commission on July 6, 2021 in connection with Pison Offering 11.  James signed the Form D.

93.     Several investors purchased promissory notes, collectively totaling $418,905, in Pison Offering 11, again without being told their money would go to James.

**l.  October 2021 Equity Offering ("Pison Offering 12")**

94.     On October 28, 2021, James wrote an email, which he transmitted to existing Pison investors, in which he discussed a contemplated $3 million offering of Pison's shares.

Attached to James's email was a PPM for an offering of Pison's shares, as well as a

presentation about Pison's business.

95.    The PPM contained a summary section titled "Key Terms of the Offering and

the Class A Voting Common Stock."  In that section, next to the heading "Use of

Proceeds", the PPM stated the funds raised in the offering would be used:

> (a) to acquire raw materials to make sufficient inventory to meet customer's needs;
> (b) to continue to create and protect the intellectual property and research and
> development of the Company; (c) to fund the sale, marketing and promotion of the
> Company's services to its potential customers; (d) to provide working capital to fund
> expenses related to general operations and administration of the Company and (e) to
> pay off existing debt, as needed, including, potentially, amounts outstanding under
> the Convertible Notes. The Company may, in its sole discretion, decide to allocate
> the net Offering proceeds to different working capital categories and in any
> proportion it deems reasonable or utilize them for other reasons.

96.    The PPM contained a section titled "Remuneration of Directors and

Executive Officers."  That section stated that directors were not compensated for their

services and executive officers had received no salary.  The section further stated:

"Executive officers have elected to defer going onto the Company's payroll in order to

maximize the available cash to fund the Company's available cash o [sic]."

97.    The PPM contained a section titled Use of Proceeds.  That section stated that

the proceeds of the offering would be used for "working capital to fund expenses related to

general operations and administration of the Company (consists primarily of employee

compensation, insurance, regulatory and legal fees, facilities and related costs and

outstanding accounts payable[)]."

98.    Pison filed a Form D with the Commission on November 29, 2021 in

connection with Pison Offering 12.  James signed the Form D.

99.     Two investors purchased shares in the offering, collectively totaling $130,000, without being told Pison would use the money to prioritize payments to James over investors and other creditors.

### C. James's Offer and Sale of Personally-Held Pison Securities

100.    Between at least December 2017 and September 2022, James offered and sold his personally-held Pison securities and raised approximately $22.2 million from investors. James found prospective investors through referrals from family, friends, employees, or sought additional investments from existing investors.

101.    Pison Stream Solutions, LLC changed its corporate form in August 2018, and converted its membership interests into shares of Pison stock.  Thereafter, the securities James sold to investors were his personal Pison shares.  James sometimes documented the sale of his shares with a share purchase agreement.

102.    In oral communications, James told investors he was selling his personal securities to raise funds for Pison either because Pison needed money in short order to secure necessary inventory, purchase raw materials, or satisfy other immediate obligations, and/or to avoid diluting existing shareholders' holdings through issuance of additional equity securities of Pison.

103.    James told investors he would direct or loan the proceeds of the sales to Pison for the company's use.  James told certain investors he would retain approximately 35% of the proceeds to cover tax liabilities he incurred on the transactions.  James failed to tell investors that he would use a substantial portion of the proceeds to fund his own personal lifestyle.  In reality, James never paid anywhere close to 35% of his personal sales proceeds for income taxes, and instead spent investor money on lavish purchases and expenditures.

21

### a. **December 2017 – January 2018**

104.     In December 2017 and January 2018, James made two sales of his own membership interests in Pison Stream Solutions, LLC to Investor 1.

105.     Before the sales, James explained to Investor 1 that he was selling his own equity securities but that he would put the money back into Pison.

106.     Investor 1 paid $50,000 to James for each purchase, for a total of $100,000.

107.     Each of those sales was documented with a written consent of the members of Pison Stream Solutions, LLC.  James signed both consents on behalf of the company.  Each of the consents stated that James was transferring 1% of his membership interests to Investor 1.

### b. **February 2018 – November 2018**

108.     Beginning in February 2018, James and his agents, acting at James's direction, approached several prospective investors and told them Pison needed money. James or his agents, at James's direction, told the prospective investors their funds would be used to support Pison.  In some instances, James or his agents told prospective investors he would retain a portion of the investor funds to cover capital gains tax liabilities he would incur on the sales.  But neither James nor his agents, who were unaware of how James would spend the money, told prospective investors that James would use invested funds to pay any other personal expenses.

109.     Approximately five investors purchased securities from James between February 12, 2018 and November 14, 2018.  Collectively, those investors paid $12,673,428 for those securities.

c.    **September 2019**

110.    In September 2019, James approached Investor 2 and Investor 3 to offer them additional Pison securities from his personal holdings.

111.    James told Investor 2 and Investor 3 that the money they invested would go to support Pison.

112.    On or about September 9, 2019, Investor 2 and Investor 3 each purchased $500,000 of Pison securities, for a collective total of $1 million, from James.

d.    **November 2019**

113.    In late October and early November 2019, James offered additional Pison securities he owned to prospective investors from his personal holdings.

114.    On November 5, 2019, James entered into a Share Purchase Agreement with a group of approximately ten investors who agreed to purchase from James a collective total of 8.125% of Pison's outstanding securities for $1,625,000.

115.    The Share Purchase Agreement contained a section titled Representations and Warranties made by James.  One of the warranties James made was "that at least 65% of the proceeds from the sale of the Shares will be loaned back into Pison, on terms similar in nature to previous lending agreements with Joseph James. . . ."

116.    In accordance with the Share Purchase Agreement, the investors collectively paid $1,625,000 to James for his Pison securities.

e.    **January 2020 – December 2020**

117.    Between January 2020 and December 2020, James sold additional shares of his Pison stock to approximately 25 investors.

118.    Before those investors agreed to invest, James made oral representations to them that the funds they provided to him would be used for the benefit of the company.

119.    Some of the share purchase agreements used during this time period included an addendum signed by James.  The addendum, which was dated May 13, 2020, stated: "Joseph James, CEO, President and Founder of the Company has agreed that, the proceeds from this issuance, will be used to support the needs of the company going forward in the form of loans with interest rate set and approved by the Board of Directors of Company."

120.    Investors paid James a total of $4,569,822 during this time period to purchase Pison securities from him.

**f.    January 2021 – December 2021**

121.    Between January 2021 and December 2021, James sold additional shares of Pison stock to approximately 23 investors.

122.    Before those investors agreed to invest, James made oral representations to them that the funds they provided to him would be used for the benefit of the company.

123.    Some of the share purchase agreements used during this time period included an addendum signed by James.  This addendum, which was dated August 13, 2021, differed somewhat from the May 13, 2020 addendum.  The August 13, 2021 addendum stated: "Joseph James, CEO, President and Founder of the Company, has agreed that the proceeds from the Share Sales will be used to support the needs of the company going forward in the form of loans with interest rate set and approved by the Board of Directors of the Company."  James further agreed that loan proceeds "will be used exclusively for salaries and rent expense of the Company, or to pay down existing liabilities relating to the same."

24

124.    The addendum also stated that James was entitled to retain "such portion of the Share Sale proceeds that is reasonably deemed to represent Mr. James' capital gains tax liability in connection with the Share Sale."  Neither the share purchase agreement nor the addendum provided that James would retain investor funds for any other reason.

125.    In total, investors paid James a total of $2,099,548 during this time period to purchase Pison securities from him.

g.    **January 2022 – November 2022**

126.    Between January and November 2022, James sold equity securities to one additional investor for $150,000.

**D. Pison and James Made Oral and Written Misrepresentations to Investors**

127.    In addition to statements in the offering documents and purchase agreements discussed above in paragraphs 30 - 126, James, and others from Pison acting at his direction, made numerous oral and written representations to prospective investors.  James and his agents—including Board Member 1, Vice President 1, Investor 1, Investor 4, Investor 5, and Investor 6—repeatedly represented in oral communications during the period from December 2017 to September 2022 that investors' money would be used to support Pison's business operations.  Neither James nor anyone else from Pison, who were unaware of how James spent investor money, told investors James would use their money to fund his personal purchases and support his extravagant lifestyle.

128.    On some occasions, James or his agents told investors he would retain a portion of the proceeds from the sale of his personal securities to cover tax liabilities he incurred in connection with the sale.  James and his agents, who were unaware of how James spent investor money or the amount of taxes he incurred, did not disclose to

25

prospective investors that he would retain funds for any other personal use or that James would pay taxes in amounts far less than the amount of investor money he retained for purported tax purposes.

129.    In addition to oral representations, James and his agents also represented in written communications that funds raised would be used for the benefit of Pison, and not for the personal benefit of James.

130.    For example, in or around November 2019, James engaged in discussions to sell his personal securities to a group of investors, including people who were not current Pison shareholders.  The sale required authorization from Pison's board.  James told the board members that he would loan 65% of the proceeds of the sales to Pison, while retaining the remaining 35% to pay capital gains taxes he incurred on the sales.  Based on the representations made by James, the board authorized the sale of James's securities.

131.    One of the investors to whom James offered some of his personal securities in November 2019 was Investor 4.  After agreeing to invest, Investor 4 asked James if Pison still needed more funds and offered to contact a few of his friends to see if they would be interested in purchasing securities from James.  After James agreed, Investor 4 located some additional people who were willing to invest.

132.    In a text message dated November 4, 2019, Investor 4 told James that all of the prospective investors he identified would need assurances that the money, less any tax liabilities, would be going to Pison.  Later that day, James responded to Investor 4 with a text message stating "The monies being raised are definitely going into the business less taxes etc."

133.    In another example, on May 10, 2020, Vice President 1 sent a text message to James saying he had located a potential investor interested in purchasing James's personal securities.  But Vice President 1 requested that, to facilitate the sale, James provide a document confirming the "proceeds of which will go to support Pison efforts."

134.    Less than an hour later, James responded to Vice President 1's request with a series of text messages.  First, James stated: "Btw I am sure you know I will be using the money to help fund the company.  The other two guys said they didn't need those restrictions because they know that I will be using the funds because I have since day one." Then, James added: "Of course I have to pay taxes out of etc."  James's response concluded by stating: "Just know [Vice President 1], funds will be used for company expenses raw materials as in the past etc."

135.    Another time, on July 28, 2020, two prospective investors sent Investor 4 an email expressing interest in purchasing Pison securities from James, but posing several questions about the company.  One of their questions was whether the capital being raised would go to the company.  Investor 4 responded by saying James "commits to putting minimum 70% into co. 30% usually reserved for taxes."  Investor 4 also confirmed that capital had been used the same way in previous sales and that there would be a representation and warranty to that effect in the share purchase agreement.

136.    In yet another example, on November 17, 2020, Vice President 1 sent a text message to James saying there were a few potential investors interested in purchasing securities.  Vice President 1 posed several questions to James: "How much do you need? What is the specific use of proceeds?  Can [CFO] show a 60 day cash flow with projected revenues and expenses?"

137. Twelve minutes later, James responded with a text message: "[Vice President 1] we are behind on bills payroll utilities general things remember our cash burn is 600k and we only been bringing in minimums over the last two months to cover payroll so we are behind we need to pay insurance etc."

138. The representations made by James and his agents regarding the use of funds received from investors were false. Throughout nearly the entire time they were selling Pison securities between December 2017 and September 2022, Pison and James were diverting large sums of money received from investors to James for his personal use.

139. In total, James orchestrated hundreds of transfers back and forth between Pison's bank accounts and his personal accounts. Investors were the source of those funds because Pison had no other significant source of income—apart from government grants and loans (that were supposed to be used for Pison's business) totaling less than $2 million—during that time.

140. Pison's and James's misrepresentations regarding the intended use of investor funds were material. In making an investment decision, a reasonable investor would consider it important that—rather than use investor funds to support and grow Pison's business as promised—James used a substantial portion of those investor funds from the sales of his Pison securities to purchase automobiles, homes, a private airplane, and luxury goods for his personal benefit. Pison used the investor funds it received directly from Pison Offerings 1 through 12 to make payments to James, which James in turn used to make personal purchases. James also retained investor funds he received from the sale of his personally-held Pison securities and used them to make personal purchases.

141.    James and Pison acted with *scienter*.  At the time they offered and sold Pison securities, James and Pison, through James, knew or recklessly disregarded that the representations to prospective investors regarding the use of investor proceeds were false, misleading, and omitted material information.  They knew, or recklessly disregarded, that James had received, and was continuing to receive, millions of dollars of investor proceeds and using those funds for his own personal benefit rather than to support and grow Pison's business, as represented.

142.    In making these representations and omissions, James and Pison also acted negligently.

**E.  James Loaned Funds to Pison, Which Prioritized Repaying Him Over Other Noteholders Supposedly on Equal Footing With Him**

143.    When James received investor funds from selling his personal securities, he loaned some of the proceeds to Pison, which characterized the loans on its books as working capital advances.

144.    In December 2018, Pison issued a note to James that memorialized his working capital advances up to that point.  The note had a principal amount of $5.3 million and an annual interest rate of 10%.

145.    When Investor 2 and Investor 3 purchased their notes in Pison Offering 3, as more fully described in paragraphs 44 - 47 above, all notes issued by Pison to James, Investor 1, Investor 2, or Investor 3 were deemed to be Senior Notes.  The Senior Notes were all to be repaid on a *pro rata* basis, but had priority of repayment over borrowings Pison received from other sources.

146.    In or around October 2019, Pison and the holders of the Senior Notes, including James, amended the terms of their notes to match the interest rate offered to

investors in Pison Offering 5 (a variable rate of 15% to 25%) and to make the Senior Notes subordinate to investors in that offering.

147.    In or around February 2020, Pison and the holders of the Senior Notes, including James, again amended the terms of their notes to make them equal in repayment priority to investors in Pison Offering 7.

148.    In or around September 2020, Pison and the two remaining holders of the Senior Notes, James and Investor 1, again amended the terms of their notes to make them equal in repayment priority to investors in Pison Offering 9.  By that time, Investor 2 and Investor 3 no longer held any Senior Notes, because they had converted their notes into shares of Pison.

149.    After December 2018, James continued to make additional working capital advances to Pison.  Pison did not issue a new note to James, but instead tracked the working capital advances on a spreadsheet as loans with a 15% interest rate.

150.    Pison treated all of the working capital advances as payable to James whenever James requested repayment, without regard to the obligations Pison had to its other noteholders or creditors.  James and Pison did not disclose to investors that Pison's repayment of James's working capital advances would take precedence over payments to investors or creditors.  In treating James's working capital advances as payable on demand, Pison and James violated the provisions of the notes purchased by the Senior Note holders and the purchasers of notes in Pison Offering 5, Pison Offering 7, and Pison Offering 9. Pison and James prioritized payments solely to James, regardless of the payment priority terms of other investors' notes.

151.   Between June 2018 and May 2022, Pison made approximately 45 payments, totaling approximately $6.2 million, to James for repayments of his working capital advances.  Pison made payments to James even during periods when it was not repaying holders of its promissory notes and other creditors.

152.   James and Pison never disclosed that Pison would prioritize paying James's working capital advances over other noteholders and creditors.

**F.  James and Pison Misused Investor Funds for James's Personal Benefit**

153.   Between December 2017 and September 2022, investors paid a total of approximately $32.5 million to purchase Pison securities, both from James and from the company.  At the direction of James and/or Pison, investors sent approximately $16.2 million of those funds to James, and $16.3 million directly to Pison.

154.   When investors purchased securities from the company, Pison directed the investors to send their funds to a Pison bank account.  When investors purchased James's personal securities prior to August 2018, James directed the investors to send their funds to a Pison bank account, and beginning in August 2018 he directed the investors to send their funds to one of his personal bank accounts.

155.   James and Pison made hundreds of transfers back and forth between James's personal bank accounts and the company's bank accounts.  James directed all of those transfers.

156.   James used some of the investor funds he received into his personal accounts for Pison's benefit, both by transferring cash to the company and by making payments on its behalf.

157.    But at James's direction, Pison used investor funds for James's personal benefit.  Between December 2017 and July 2023, Pison made approximately $6.2 million in cash transfers to James.  Pison also made approximately $2.3 million in payments on behalf of James.

158.    James also spent investor funds deposited into his personal bank accounts to make numerous personal expenditures and live a luxurious lifestyle.

159.    In sum, James received a net personal benefit of more than $10.8 million from the deposits of investor funds, cash transfers back and forth between Pison's accounts and James's personal accounts, and payments James and Pison made on behalf of each another.

160.    James and Pison began diverting investor funds for James's personal benefit no later than March 2018.  James and Pison continued diverting investor funds for James's personal benefit throughout the duration of their fraudulent scheme.

161.    Between March 2018 and July 2023, James spent investor funds as follows (all numbers approximate):

- $3.4 million to purchase, finance, maintain, and use a private jet;

- $2 million to purchase James's personal residence in Ohio;

- $1.3 million in rent for a $29,000/month apartment in New York City;

- $855,000 in personal credit card payments;

- $850,000 in retail purchases, including $285,000 at a luxury watch retailer, $150,000 at an auction house, $120,000 at an art gallery, $50,000 at a jeweler, and $40,000 at a designer clothing company;

- $700,000 in home renovations and expenses, including theater equipment, a piano, and $60,000 in aquarium and fish expenses;

- $630,000 to purchase and maintain several automobiles from manufacturers including Maserati, Land Rover, BMW, Audi, and Cadillac;

- $425,000 in personal loan and lease payments, including a lease on a Rolls-Royce automobile;

- $400,000 to purchase a vacation home in Florida;

- $310,000 in cash and miscellaneous withdrawals;

- $250,000 in payments to family members; and

- $225,000 in personal property taxes.

162.    Beginning in late 2021, as the flow of investor funds slowed, James had trouble maintaining the lavish lifestyle he had created for himself.  As a result, he sold some of the expensive assets he had acquired, including the private airplane and several automobiles.

163.    The vast majority of funds deposited into James's personal bank accounts between June 2018 and July 2023 came either from Pison, from purchasers of Pison securities, or from the sale of assets previously purchased with investor funds.

164.    James told some investors who bought his personal securities, and the Pison board with respect to the November 2019 transaction, that he would retain a portion, typically 35%, of the investor proceeds to cover his personal tax liabilities incurred as a result of his securities sales.  James did not disclose to any investors that he would use their funds for any other personal purpose.

165.    During the entire period from June 2018 through July 2023, James paid less than $2.3 million in income taxes, which is far less than either the $10.8 million in investor

funds he used for his personal benefit, or 35% of the proceeds he received for selling his personal securities.

166.    James and Pison acted knowingly, recklessly, or alternatively negligently, when they used investor funds to pay James's personal expenses and failed to use all of them for the disclosed purposes of supporting Pison's business or to pay James's tax obligations arising from his sale of his personally-held Pison securities.

### G. James Transferred Assets He Acquired With Investor Funds to Relief Defendants Genacts and Soisi

167.    James titled some of the assets he acquired with the proceeds of investor funds, such as homes, automobiles, and his personal airplane, in the names of Relief Defendants Genacts and Soisi.  Assets titled in Genacts's name include, but are not limited to, James's Florida home, two BMW automobiles, an Audi sport utility vehicle, and a Corvette.  Assets titled in Soisi's name include, but are not limited to, James's Ohio home, two Land Rover vehicles, three other sport utility vehicles manufactured by Maserati, Cadillac, and Lincoln, a Ford Mustang Shelby GT500, and a pickup truck.

168.    James also transferred cash to Genacts.  The cash transferred to Genacts consisted of investor funds or the proceeds from the sale of assets purchased with investor funds.

169.    Genacts and Soisi have no legitimate claim to the investor monies, or the assets purchased with those monies, that James transferred to Genacts and Soisi.

### COUNT I
### Fraud in the Offer or Sale of Securities
### [Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)]
### (Against James and Pison)

170.    Paragraphs 1 - 169 are hereby realleged and incorporated herein by reference.

171.     By engaging in the acts and conduct described in this Complaint, Defendants

James and Pison, directly or indirectly, in the offer or sale of securities, by use of the means

or instruments of transportation or communication in interstate commerce or by use of the

mails, used and employed devices, schemes, or artifices to defraud; obtained money or

property by means of untrue statements of a material fact or an omission to state material

facts necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading; and engaged in transactions, practices, or

courses of business which operated or would operate as a fraud and deceit upon the

purchaser.

172.     James and Pison engaged in the fraudulent conduct described above

knowingly or recklessly.

173.     James and Pison also acted negligently in engaging in the conduct described

above.

174.     By reason of the foregoing, Defendants James and Pison, directly or

indirectly, violated, and, unless enjoined, will continue to violate Section 17(a) of the

Securities Act, 15 U.S.C. § 77q(a).

## COUNT II
### Fraud in Connection with the Purchase or Sale of Securities
### [Exchange Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5]
### (Against James and Pison)

175.     Paragraphs 1 - 169 are hereby realleged and incorporated herein by reference.

176.     By reason of the acts and conduct described in this Complaint, Defendants

James and Pison directly or indirectly, in connection with the purchase or sale of securities,

by the use of means or instrumentalities of interstate commerce or of the mails or any

facility of a national securities exchange: (a) used and employed devices, schemes, or

artifices to defraud; (b) made untrue statements of a material fact or omitted to state

material facts necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading; and (c) engaged in acts,

practices, or courses of business which operated or would operate as a fraud and deceit upon

any person.

177.    James and Pison engaged in the fraudulent conduct described above

knowingly or recklessly.

178.    By reason of the foregoing, James and Pison, directly or indirectly, violated,

and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C.

§ 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

### COUNT III
### Relief Defendants
### [Against Genacts and Soisi]

179.    Paragraphs 1 - 169 are hereby realleged and incorporated herein by reference.

180.    The assets obtained by Genacts and Soisi are the proceeds, or were purchased

with the proceeds, of the securities violations committed by James and Pison as described in

this Complaint.

181.    Genacts and Soisi have no legitimate claim to the assets they obtained as a

result of the fraudulent scheme described in this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court:

### I.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil

36

Procedure, permanently enjoining James and Pison, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from:

    a.       violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

    b.       violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b- 5 thereunder [17 C.F.R. §§ 240.10b-5].

## II.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedures, permanently enjoining James from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered transaction; provided, however, that such injunction shall not prevent James from purchasing or selling securities listed on a national securities exchange for his own personal account.

## III.

Issue an Order prohibiting James from acting as an officer or director of any public company, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## IV.

Order Defendants and Relief Defendants to pay disgorgement of any unjust enrichment they received as a result of the violations alleged herein, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), 78u(d)(7)].

## V.

Order each Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.


Dated:   May 17, 2024

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By:   /s/ Christopher H. White
    Christopher H. White (IL Bar No. 6280031)
    Benjamin J. Hanauer (IL Bar No. 6280156)
    Raven A. Winters (IL Bar No. 6291077)

    175 West Jackson Blvd., Suite 1450
    Chicago, IL 60604
    Telephone: (312) 353-7390
    whitech@sec.gov

    *Attorneys for the Plaintiff*